## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

CAMERON TIETZ,

     *Plaintiff*,

v.

CORIZON HEALTH, INC.; PATRICK WARREN; KEITH PAPENDICK; RICHARD RUSSELL; KIM FARRIS; JULIANA MARTINO; LISA ADRAY; NURSE DUNCAN; ROBERT LEDUC; SERGEANT EVANS; EUTRILLA TAYLOR; JULIE TOLLEY; ALAN GREASON; KRISTOPHER STEECE; CONNIE HORTON; WARDEN'S ASSISTANT BEAULIEU; S. THOMPSON; RUM BATHO; SERGEANT DESCROCHE; SERGEANT BAWKES; WILLIAM STURM; OFFICER SMITH; CASSONDRA BALBIERZ; SHERI NEWCOMB; BILLY WEEMS; KATHLEEN COULLARD; OFFICER MAGAYHEE; VIRGINIA OLMSTEAD; BRITTANY BEHM; OFFICER BENSON; OFFICER COLLINS; OFFICER GALLAGHER; WILLIAM MYOTTE; OFFICER WESTON,

     *Defendants*.

Case No. 2:20-cv-10814

Hon. Paul D. Borman

_____

Solomon M. Radner (P73653)
EXCOLO LAW, PLLC
Attorney for Plaintiffs
26700 Lahser Road, Suite 401
Southfield, MI 48033
(866) 939-2656
sradner@excololaw.com

_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

1

NOW COMES Plaintiff, CAMERON TIETZ, by and through his attorneys, complaining of Defendants, and respectfully alleges as follows:

## JURISDICTION AND VENUE

1.     This is a civil rights action in which the Plaintiffs seek relief for the violation of their rights secured by 42 U.S.C. § 1983 and the First, Eighth, and Fourteenth Amendments.

2.     This Court is granted jurisdiction under 28 U.S.C. § 1331.

3.     Venue is appropriate in the Eastern District of Michigan pursuant to 28 U.S.C § 1391(b) since a majority of the acts providing the legal basis for this complaint occurred in the Macomb Correctional Facility in the Township of Lenox, County of Macomb, State of Michigan.

## COMPLIANCE WITH PRE-EXHAUSTION REQUIREMENTS

4.     Plaintiff adopts by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

5.     Plaintiff has complied with the Pre-Exhaustion Requirements of the Prison Litigation Reform Act through the appropriate grievance processes of the MDOC for the grievances upon which this litigation is based.

6.     MDOC's grievance procedure is a known sham and state officials across the MDOC utilize the grievance system as a mechanism to chill prisoner's

rights and abilities to bring lawsuits for violations of clearly established constitutional rights.

7. Plaintiff has filed countless grievances addressing the issues raised in this matter. Defendants continuously refused to properly investigate Plaintiff's grievances and routinely rubber stamped their colleagues and subordinates' denials demonstrating deliberate indifference to the constitutional violations described in the grievances. Plaintiff has exhausted all available administrative remedies.

## PARTIES

8. Plaintiff, CAMERON TIETZ ("Tietz"), is a resident of the State of Michigan.

9. Defendant, Corizon Health, Inc. ("Corizon"), is contracted by the Michigan Department of Corrections ("MDOC") to provide medical services to inmates housed within MDOC correctional facilities. Through its doctors and medical providers, Defendant Corizon is responsible for providing health care to inmates including but not limited to approving necessary visits with specialists, approving necessary surgeries and treatments plans, and approving medications prescribed to incarcerated individuals. Defendant Corizon acts through its decision makers and supervisors. At all times relevant, Defendant Corizon was acting under the color of law.

10. Defendant, Patrick Warren ("Warren"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as warden of Macomb Correctional Facility ("MRF"). At all times relevant, Defendant Warren was acting under color of law. Defendant Warren is being sued in his individual and supervisory capacity.

11. Defendant, Keith Papendick ("Papendick"), was at all times relevant a resident of the State of Michigan and employed by Corizon and contracted by MDOC as the Utilization Manager. Defendant Papendick is responsible for approving necessary specialist visits and procedures for individuals incarcerated with the MDOC.

12. Defendant, Richard Russell ("Russell"), was at all times relevant a resident of the State of Michigan and employed as the manager of the grievance section of the office of legal affairs for the MDOC at the central officer in Lansing. At all times relevant, Defendant Russell was acting under color of law. Defendant Russell is being sued in his individual and supervisory capacity.

13. Defendant, Kim Farris ("Farris"), was at all times relevant a resident of the State of Michigan and employed by Corizon as a physician's assistant attending patients in healthcare. At all times relevant, Defendant Farris was acting under the color of law. Defendant Farris is being sued in her individual capacity.

14.     Defendant, Juliana Martino ("Martino"), was at all times relevant a resident of the State of Michigan and employed by Corizon as a physician's assistant attending patients in healthcare. At all times relevant, Defendant Martino was acting under the color of law. Defendant Martino is being sued in her individual capacity.

15.     Defendant, Lisa Adray ("Adray"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a nurse treating patients in healthcare. At all times relevant, Defendant Adray was acting under the color of law. Defendant Adray is being sued in her individual capacity.

16.     Defendant, Nurse Duncan ("Duncan"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a nurse treating patients in healthcare. At all times relevant, Defendant Duncan was acting under the color of law. Defendant Duncan is being sued in his individual capacity.

17.     When referred to collectively, Defendants Papendick, Adray, Duncan, Farris, and Martino will be referred to as "Healthcare Officials".

18.     Defendant, Robert Leduc ("Leduc"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as an inspector at MRF. At all times relevant, Defendant Leduc was acting under the color of law. Defendant Leduc is being sued in his individual and supervisory capacity.

19.     Defendant, Sergeant Evans ("Evans"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a sergeant at MRF.

At all times relevant, Defendant Evans was acting under the color of law. Defendant Evans is being sued in his individual and supervisory capacity.

20. Defendant, Eutrilla Taylor ("Taylor"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a Grievance Coordinator at MRF. At all times relevant, Defendant Taylor was acting under the color of law. Defendant Taylor is being sued in her individual capacity.

21. Defendant, Julie Tolley ("Tolley"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a correctional officer at MRF. At all times relevant, Defendant Tolley was acting under the color of law. Defendant Tolley is being sued in her individual capacity.

22. Defendant, Alan Greason ("Greason"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a correctional officer at MRF. At all times relevant, Defendant Greason was acting under the color of law. Defendant Greason is being sued in his individual capacity.

23. Defendant, Kristopher Steece ("Steece"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a correctional officer at MRF. At all times relevant, Defendant Steece was acting under the color of law. Defendant Steece is being sued in his individual capacity.

24. Defendant, Warden Connie Horton ("Horton"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as warden

of Chippewa Correctional Facility ("URF"). At all times relevant, Defendant Horton was acting under color of law. Defendant Horton is being sued in her individual and supervisory capacity.

25. Defendant, Warden's Assistant Beaulieu ("Beaulieu"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as Assistant to the Warden at URF. At all times relevant, Defendant was acting under the color of law. Defendant Beaulieu is being sued in his/her individual capacity.

26. Defendant, S. Thompson ("Thompson"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a Resident Unit Manager at URF. At all times relevant, Defendant Thompson was acting under the color of law. Defendant Thompson is being sued in his individual and supervisory capacity.

27. Defendant, Resident Unit Manager Batho ("Batho"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a Resident Unit Manager at URF. At all times relevant, Defendant Batho was acting under the color of law. Defendant Batho is being sued in his individual and supervisory capacity.

28. Defendant, Sergeant Descroche ("Descroche"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a sergeant at URF. At all times relevant, Defendant Descroche was acting under the

color of law. Defendant Descroche is being sued in his individual and supervisory capacity.

29. Defendant, Sergeant Bawkes ("Bawkes"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a sergeant at URF. At all times relevant, Defendant Bawkes was acting under the color of law. Defendant Bawkes is being sued in his individual capacity.

30. Defendant, Sergeant William Sturm ("Sturm"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a sergeant at URF. At all times relevant, Defendant Sturm was acting under the color of law. Defendant Sturm is being sued in his individual and supervisory capacity.

31. Defendant, Officer Smith ("Smith"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a correctional officer at URF. At all times relevant, Defendant Smith was acting under the color of law. Defendant Smith is being sued in his/her individual capacity.

32. Defendant, Cassondra Balbierz ("Balbierz"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a correctional officer at URF. At all times relevant, Defendant Balbierz was acting under the color of law. Defendant Balbierz is being sued in her individual capacity.

33. Defendant, Sheri Newcomb ("Newcomb"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a correctional

officer at URF. At all times relevant, Defendant Newcomb was acting under the color of law. Defendant Newcomb is being sued in her individual capacity.

34. Defendant, Billy Weems ("Weems"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a correctional officer at URF. At all times relevant, Defendant Weems was acting under the color of law. Defendant Weems is being sued in his individual capacity.

35. Defendant, Kathleen Coullard ("Coullard"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a correctional officer at URF. At all times relevant, Defendant Coullard was acting under the color of law. Defendant Coullard is being sued in her individual capacity.

36. Defendant, Officer Magayhee ("Magayhee"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a correctional officer at URF. At all times relevant, Defendant Magayhee was acting under the color of law. Defendant Magayhee is being sued in his/her individual capacity.

37. Defendant, Virginia Olmstead ("Olmstead"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a correctional officer at URF. At all times relevant, Defendant Olmstead was acting under the color of law. Defendant Olmstead is being sued in her individual capacity.

38. Defendant, Brittany Behm ("Behm"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a correctional

officer at URF. At all times relevant, Defendant Behm was acting under the color of law. Defendant Behm is being sued in her individual capacity.

39.     Defendant, Officer Benson ("Benson"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a correctional officer at URF. At all times relevant, Defendant Benson was acting under the color of law. Defendant Benson is being sued in his/her individual capacity.

40.     Defendant, Officer Collins ("Collins"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a correctional officer at URF. At all times relevant, Defendant Collins was acting under the color of law. Defendant Collins is being sued in his/her individual capacity.

41.     Defendant, Officer Gallagher ("Gallagher"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a correctional officer at URF. At all times relevant, Defendant Gallagher was acting under the color of law. Defendant Gallagher is being sued in his/her individual capacity.

42.     Defendant, William Myotte ("Myotte"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a correctional officer at URF. At all times relevant, Defendant Myotte was acting under the color of law. Defendant Myotte is being sued in his individual capacity.

43.     Defendant, Officer Weston ("Weston"), was at all times relevant a resident of the State of Michigan and employed by the MDOC as a correctional

officer in the Food Services division at URF. At all times relevant, Defendant Weston was acting under the color of law. Defendant Weston is being sued in his/her individual capacity.

## STATEMENT OF FACTS

### Background

44.    Plaintiff, at all times relevant to this complaint, was incarcerated in the custody of the MDOC.

45.    Plaintiff developed symptoms including high fever, body aches, severe redness and swelling in his leg, and burning pain in his leg. The prison healthcare services initially believed Plaintiff had the flu, but after his symptoms failed to resolve, he was transferred to an external hospital. The hospital physician determined that Plaintiff's leg was infected with cellulitis (a form of streptococcal infection), held the Plaintiff overnight, and successfully treated the infection with IV infused antibiotics. The physician instructed Plaintiff that, if the same symptoms should ever occur again, he should inform the prison healthcare services that the infection is cellulitis and that similar treatment is required. Upon information and belief, this information is documented within Plaintiff's medical records.

46.    At all relevant times prior to July 30th, 2019, Plaintiff was incarcerated in MRF. At that time, Plaintiff was transferred to URF, where he has remained until present. URF is widely known as a disciplinary facility within the MDOC.

47.     In addition to Jewish Sabbath services, MRF offers certified Kosher meals for Jewish inmates, as well as Shabbat and holiday services with *Minyan*. This is partially through a unique partnership with The Aleph Institute, a Jewish non-profit. MRF is the only MDOC facility that can accommodate these important tenets of the Jewish faith.

48.     URF and other MDOC facilities offer only non-certified Kosher meals and basic Jewish Sabbath services.

49.     Prior to being transferred to URF, Plaintiff was under an administrative transfer hold preventing MDOC from transferring him to another facility due to the unique ability of MRF to accommodate Plaintiff's religious beliefs.

50.     Plaintiff's transfer to URF was retaliatory action intended to deter Plaintiff from continuing to file grievances against the MDOC, and this retaliation continued after being transferred to URF.

## Hernias

51.     In approximately 2016, Plaintiff first began to develop a hernia. He noticed a ripping feeling in his abdomen and was bedridden for weeks. Soon after, he developed a mass protruding from his abdomen that grew to approximately the size of a baseball.

52.     Plaintiff sought care from MRF Healthcare Officials, who claimed that it was an overdeveloped muscle and that there was no protrusion. Plaintiff continued to seek medical care, but no additional care was provided.

53.     In approximately April of 2018, Plaintiff developed a second hernia that grew to protrude near his navel. Plaintiff again sought care from MRF Healthcare Officials and was explicitly told that they do not treat hernias. Plaintiff attempted to just live with the pain but was struggling. Defendant Martino and Defendant Adray knew Plaintiff had a hernia as well as a golf ball sized mass sticking out of his body and refused to follow up or prescribe any medication. As a result the hernia got worse. Plaintiff filed a grievance on the issue.

54.     In approximately December of 2018, the second hernia ripped further, causing daily groin pain and difficulty using the restroom. Plaintiff again sought care from Defendants Healthcare Officials, and again he was denied care.

55.     Plaintiff's two hernias continued to worsen until they seemed to have torn nearly into each other. The pain grew so severe that Plaintiff was again bedridden for several weeks.

56.     Plaintiff continued to seek medical care and eventually MRF Healthcare Officials conducted an X-ray examination. However, Plaintiff never received a follow-up or results from this X-ray.

57.     Plaintiff continued to seek medical care. At his next visit, an MRF Healthcare Official stated "I don't know why you keep coming over. We aren't going to help with a hernia." Defendant Healthcare Officials then even insisted that Plaintiff did not have a hernia and was merely constipated.

58.     Plaintiff has since developed a third hernia in his groin, causing severe groin and testicular pain. This has caused difficulties urinating, in addition to Plaintiff's ongoing constipation.

59.     Plaintiff continued to seek medical care. Rather than addressing the root issue, Plaintiff's hernias, Defendant Healthcare Officials placed Plaintiff on eight pills of stool softeners per day. This has caused severe diarrhea and even more pain. In addition, Plaintiff has suffered severe irritation as a result of prolonged diarrhea. He has requested wipes or additional bathroom tissue to alleviate this irritation, but these requests have been denied.

60.     Plaintiff continued to seek medical care and was given a second X-ray examination. Again, Plaintiff never received a follow-up or results from this X-ray.

61.     Plaintiff continues to suffer from these untreated issues.

62.     Defendants Adray, Farris, Martino and Duncan, with knowledge of Plaintiff's serious medical needs, denied medical treatment to Plaintiff.

63.     Upon information and belief, Defendants were aware of the fact that Plaintiff had serious and legitimate medical needs that were repeatedly ignored.

## Streptococcal Infection

64. In March 2018, Plaintiff began developing a high fever, body aches, severe swelling and redness in his leg, and burning pain in his leg. Plaintiff recognized these symptoms as the same symptoms that were present before his cellulitis diagnosis in 2013-2014. As directed by the hospital physician, Plaintiff notified Defendant Healthcare Officials of this history and the treatment required. Defendant Healthcare Officials insisted that Plaintiff only had the flu and refused to provide him with proper treatment. On several occasions Plaintiff presented with these symptoms and was not given the necessary treatment.

65. Plaintiff returned to healthcare services the following day. More than half of his leg was red, and the swelling had increased. He again attempted to inform the healthcare officials of his previous history and the treatment required, but they told him that he does not know what he is talking about and sent him back to his cell.

66. Plaintiff continued to seek treatment, and finally, on or about March 18, 2018, Plaintiff was transferred to an external hospital. By this point, the redness and swelling was affecting almost his entire leg, and he had maintained a fever of over 100°F for three days.

67. The hospital physician diagnosed Plaintiff with cellulitis for a second time. The physician also expressed great concern at the fact that it had taken so long for Plaintiff to be transferred to the hospital. He stressed that, if the issue were to

happen again, Plaintiff must be admitted more quickly. He also ordered that Plaintiff see a specialist once the infection had been treated and the swelling had receded in order to determine why the issue was recurring.

68.     Once Plaintiff returned to MRF, he was not provided with the proper antibiotics prescribed by the hospital physician for several days. Meanwhile, Plaintiff's symptoms worsened to include memory fog and nerve impingement in his leg.

69.     Despite the hospital physician's orders, Plaintiff was not allowed to see a specialist to determine why the issue was recurring.

70.     Defendant Corizon and Defendant Papendick are responsible for ensuring MDOC inmates see the necessary specialists to treat serious medical needs. Pursuant to Corizon's policy to deny necessary care for non-medical reasons, like cost-saving, Defendant Papendick denied Plaintiff's a specialist visit.

71.     In approximately August of 2018, the same process occurred. Plaintiff developed the same symptoms as he had previously and went to MRF Healthcare Officials. He informed them of his two previous incidents with cellulitis and that the hospital physician had specifically instructed him to inform the staff that the antibiotics available at MRF are insufficient to treat this type of infection, so he must receive external care.

72.     The Defendant Healthcare Officials indicated that they do not need to hear what Plaintiff has to say, gave Plaintiff Tylenol, and sent him back to his cell.

73.     On these occasions the healthcare staff called Defendant Farris, the medical provider on call when Plaintiff continuously presented with a fever and swollen red legs. Despite knowledge of Plaintiff's repeated problems and history, Defendant Farris merely instructed the nurses to give him an antibiotic and send him back to his cell. While Farris stated that she would follow up with Plaintiff about the problems he was experiencing, she did not and neither did the nurses Duncan or Adray. Farris would routinely wait several days, while Plaintiff continued to have a fever as well as swollen, painful, and red legs spreading to his stomach causing him intense pain and discomfort that prevented him from being able to move freely. On several occasions he had to go to the hospital as a result of these delays with one hospital visit lasting a month.

74.     Plaintiff repeatedly sought care from Defendant Healthcare Officials and was denied for several days. Several of his appointments were canceled without reason. Eventually, Plaintiff collapsed and had to be carried to healthcare, where officials finally transferred him to the external hospital.

75.     Plaintiff was forced to remain in the hospital for a period of two weeks, receiving ongoing IV antibiotics, in order to recover from the infection that had worsened in the days MRF Healthcare Officials refused to treat him. The hospital

physician expressed great frustration at the prolonged delay of treatment, as well as the fact that Plaintiff had still not been seen by a specialist. After these two weeks, Plaintiff was transferred to Duane Waters hospital, an MDOC hospital. There, one of John Doe Physicians made the decision to discontinue the IV antibiotics, despite the external physician's orders to continue them, and sent Plaintiff back to MRF with only oral antibiotics.

76.     After his hospitalization, Plaintiff did not see Defendant Farris anymore as his medical provider. Instead he was reassigned to Defendant Martino. Defendant Martino had full knowledge of his serious medical needs and specifically told him that he needed to be on certain medications to strengthen his GI tract and prevent an internal infection. Despite kiting and requesting said medication described by Defendant Martino and grieving the situation, Plaintiff was not given the proper medication. As his medical provider Defendant Martino was aware of this and acquiesced in the denial of prescribed medication despite knowledge of medical necessity and need to treat Plaintiff.

77.     Despite the hospital physician's orders, Plaintiff was also still not allowed to see a specialist to determine why the issue was recurring. During a follow-up appointment, MRF Healthcare Officials explicitly stated that Plaintiff would not be authorized to see a specialist. Defendant Corizon through Defendant Papendick is responsible for ensuring outside specialist care is approved for prisoners with

serious medical need. Defendants denied the hospital doctor's request that Plaintiff see a specialist.

78.     Defendant Papendick as a supervisor and policymaker for Defendant Corizon exemplifies Defendant Corizon's policy to deny medically necessary for non-medical reasons. Plaintiff was told on several occasions that he needed to see a specialist, needed to be sent to the hospital faster, needed to have certain medications to treat his serious medical needs. Defendant Corizon maintains a policy, practice, or custom that requires Defendant Papendick to send prisoners to the hospital or a specialist but then refuses to follow through with the prescribed and recommended treatment plans in order to save money and minimize the amount of outside medical care provided to incarcerated individuals.

79.     In approximately January of 2019, the same process occurred once again. Plaintiff developed the same symptoms, sought treatment from MRF Healthcare Officials, and treatment was denied for days. Finally, MRF Healthcare Officials transferred Plaintiff to the external hospital again.

80.     The hospital physician was baffled as to why Plaintiff was repeatedly being denied prompt care and access to a specialist. Despite the fact that a proper diagnosis would require the specialist to see Plaintiff when the infection was not active, the physician decided that the best approach was to have a specialist examine Plaintiff while Plaintiff was admitted for treatment. The specialist agreed that he

could not properly diagnose Plaintiff while the infection was still active, but suspected that the infection was either cellulitis or a more severe form of streptococcal.

81. The hospital physician ordered a long-term antibiotic in attempt to prevent the infection from recurring, but specifically ordered that Plaintiff also be placed on a probiotic, cautioning that if Plaintiff does not take a probiotic he will inevitably develop a stomach infection.

82. Despite the hospital physician's orders, Defendant Healthcare Officials denied Plaintiff access to probiotics. Plaintiff's stomach is now in constant pain and his nutrition levels are off, suggesting that the physician's predication of a stomach was correct.

83. Despite the hospital physician's orders, Plaintiff has still not been allowed to see a specialist to determine why the issue is recurring.

84. Upon information and belief, Defendant MRF Healthcare Officials were aware of the fact that Plaintiff had serious and legitimate medical needs that were repeatedly being neglected.

**Retaliation**

85. On or about December 30th, 2017, Defendant Leduc summoned Plaintiff into his office. Inspector Leduc called Plaintiff a "fake ass Jew" and threatened to place Plaintiff on Security Threat Group ("STG") status if Plaintiff did

not sign off on the transfer hold so that he could be transferred to another facility. Upon information and belief, this was an escalation of a months-long campaign of Defendant Leduc harassing Plaintiff, at least partially in retaliation for his affiliation with Temujin Kensu, another MDOC inmate.

86. STG status indicates gang membership, and being placed on STG status entails a significant reduction of freedoms and privileges for inmates.

87. Plaintiff has absolutely no gang or similar affiliations that would support a designation of STG status.

88. In January of 2018, Plaintiff was walking through the facility school building. Defendant Tolley was at the desk and received a phone call from Inspector Leduc, who told Defendant Tolley to stop Plaintiff, ask if he was a "real Jew," and ask if he was a gang member.

89. On or about July 9th, 2018, Inspector Leduc threatened Plaintiff with continued retaliation if Plaintiff did not sign off on the transfer hold. When Plaintiff refused, Inspector Leduc had Plaintiff fired from his employment in the chow hall. Inspector Leduc told Plaintiff that he would never get a job unless it was cleaning toilets.

90. On or about April 5th, 2019, Plaintiff was participating in a facility-wide mock pack-up exercise. Inspector Leduc, along with Defendant Greason and Defendant Steece, came to Plaintiff's cell. Inspector Leduc arbitrarily accused

Plaintiff of being in possession of drugs and made further disrespectful comments to plaintiff. Despite knowing that Inspector Leduc had no basis for his behavior, Defendant Greason and Defendant Steece stood by as Defendant Leduc harassed Plaintiff without intervening.

91.    Throughout the same day, Defendant Leduc made several comments to Plaintiff, such as "You're still here? I thought we got that hold off of you." This was an insinuation that Defendants were attempting to get Plaintiff transferred and remove his religious hold.

92.    On or about April 12, 2018, Plaintiff filed a grievance pertaining to deliberate indifference to his streptococcal infection.

93.    On or about May 11, 2018 Plaintiff filed a grievance pertaining to MRF Healthcare Officials for failing to provide healthcare, including deliberate indifference to Plaintiff's medical needs.

94.    On or about May 30, 2018, Plaintiff filed a grievance pertaining to deliberate indifference to his hernias.

95.    On or about July 8, 2018, Plaintiff filed a grievance pertaining to employment discrimination on the grounds that he had been repeatedly passed over for a tutor position. This was a direct result of Inspector Leduc's retaliatory action obstructing Plaintiff from obtaining employment that he was qualified for.

96.   On or about February 20, 2019, Plaintiff filed a grievance pertaining to deliberate indifference to his streptococcal infection and subsequent need for probiotics.

97.   On or about March 18, 2019, Plaintiff filed a grievance pertaining to deliberate indifference to his hernias.

98.   On or about March 24, 2019, Plaintiff filed a grievance pertaining to MRF Grievance Coordinator Defendant Taylor's obstruction of Plaintiff's right to file grievances by failing to properly process grievances he filed.

99.   Plaintiff filed another grievance pertaining to healthcare's denial of medication proscribed by his medical provider. Plaintiff's grievance was again arbitrarily denied by Defendant Taylor. Defendant denied his grievance as "vague" despite Plaintiff's detailed explanation that he was not receiving prescribed medication necessary for his health. He was prescribed medications by the doctor who treated him at the hospital and his medical provider at the MDOC informed him that these medications were being denied. Plaintiff exhausted the grievance at every step explaining that his grievance was not vague, and that at no point was he ever reviewed or asked for more information about the grievance. He continued to need the medication.

100.   Defendant Warden Warren reviewed the grievances and upheld the wrongful rejection of the grievance. Defendant Richard Russell, the manager of the

grievance section of the office of legal affairs for the MDOC, also upheld the wrongful rejection. Despite Defendant Taylor, Defendant Warren and Defendant Russell's explicit knowledge that Plaintiff had been prescribed medication by a doctor and was being refused the medication by healthcare, Defendants rejected Plaintiff's grievances and acted out of retaliation for Plaintiff's protected conduct of filing grievances and with deliberate indifference to his serious medical need by permitting healthcare to deny medication prescribed by a doctor for a diagnosed medical condition. Defendants are supervisors and administrators for the MDOC and have failed to intervene and acquiesced in the unconstitutional behavior of their subordinates in denying care to Plaintiff despite Plaintiff properly filing a grievance on the issue. This process continuously happens and demonstrates the futility of grievance system as orchestrated by the officials of the MDOC.

101. Defendant Taylor denied Plaintiff's grievance against her wrongful rejections as a "non-grievable issue." Defendant Greason upheld the rejection and prevented Plaintiff from filing another grievance on the issue. Plaintiff appealed the rejection and after review Defendant Warden Warren upheld the rejection.

102. On or about July 17, 2019, Defendant Tolley summoned Plaintiff to her office. Defendant Tolley asked Plaintiff if he was a participant in the program hosted by The Aleph Institute, asked Plaintiff if he was a "real Jew," asked about the medical grievances Plaintiff had filed, and threatened Plaintiff with being transferred

to another facility. Defendant Tolley also attempted to persuade Plaintiff to sign off on his transfer hold by promising that, if he did, he would only be transferred to another unit, rather than the threatened transfer to another facility if he did not. Plaintiff did not sign off on this request.

103. On or about July 21, 2019, Plaintiff filed a grievance pertaining to Defendant Tolley's threat of retaliatory transfer to another facility and the resultant obstruction of Plaintiff's ability to practice his religious beliefs.

104. On or about July 30, 2019, Plaintiff was actually transferred to URF, in direct contradiction to the transfer hold recognizing that transferring Plaintiff to another facility would inhibit his ability to practice his religion. Before being transferred, Plaintiff spoke to Defendant Evans in attempt to cancel the transfer due to the transfer hold, but Defendant Evans failed to intervene to prevent this transfer that would harm Plaintiff's ability to practice his religion.

105. During Plaintiff's transfer to URF, Plaintiff went all day without any food because no Kosher meal was provided.

106. Upon arrival at URF, Defendant Smith conducted a property review of Plaintiff's belongings. During this review, Defendant Smith tore up many of Plaintiff's personal documents, and confiscated legal papers and many other materials that were not contraband. This included Plaintiff's guitar, guitar

accessories, watch, sunglasses, fan, paints, paintbrushes, shoes, MP3 player, books, and clothing. Defendant Smith stated that Plaintiff would never get his guitar back.

107. Defendant Smith stated that this retaliatory action was because he had been notified by MRF officers to give Plaintiff a welcome, due to the grievances Plaintiff had previously filed.

108. On or about July 31, 2019, Plaintiff filed a grievance pertaining to the actual retaliatory transfer and the resultant intentional obstruction of Plaintiff's ability to practice his religious beliefs. Plaintiff's grievance was denied as a duplicate, despite the fact that it was clearly not the same issue as Plaintiff was no longer under a threat of retaliatory transfer, but had now indeed been transferred to a known disciplinary facility where he would not be permitted to practice his religious beliefs. Plaintiff's grievance was denied by Defendant Taylor and approved by Defendant Greason. After appealing to step three, Defendant Russell upheld the rejection of Plaintiff's grievance regarding the retaliatory transfer to URF.

109. On or about August 8, 2019, Plaintiff was summoned to speak with Warden's Assistant Defendant Beaulieu and Defendant Thompson. During this meeting, Plaintiff was repeatedly asked about who was contacting Lansing on his behalf, instructed to tell them to stop contacting Lansing, and threatened that "things would get worse" if people continued to contact Lansing.

110. On or about August 19, 2019, Plaintiff sent a letter to Warden Defendant Warren, explaining the difficulties he had faced in filing legitimate grievances. Plaintiff requested that Defendant Warren see to it that his grievances be processed properly. No response was received and no action was taken in response to Plaintiff's letter.

111. Defendant Warden Horton then assumed the position of Warden and began denying Plaintiff's grievances without reason. Each step Plaintiff provided the necessary receipts and disbursements regarding his guitar yet Defendant Warden Horton ignored them and continued to deny Plaintiff's grievances.

112. On or about August 20, 2019, Plaintiff was interviewed by Defendant Balbierz during a hearing about Plaintiff's guitar and other property. Defendant Balbierz alleged that Plaintiff had failed to provide proof of ownership, but refused to look at Plaintiff's paperwork demonstrating ownership or to contact Musik Haus, where the guitar was purchased, to verify that Plaintiff owned the guitar.

113. On or about August 23, 2019, Plaintiff filed a grievance pertaining to the confiscation of his guitar and retaliatory refusal to consider proof of ownership.

114. Once admitted to URF, until at least September 1, 2019, Plaintiff was frequently denied Kosher meals because he was not on the list to receive them. Plaintiff repeatedly attempted to contact the Chaplain to be added to the list for Kosher meals, but received no response.

115. On or about September 1, 2019, Plaintiff was still being frequently denied Kosher meals, and Plaintiff resorted to eating non-Kosher food that violated his religious beliefs. Plaintiff was then written up with an N.O.I. for eating a non-Kosher meal despite claiming Jewish religious status.

116. On or about September 15, 2019, Plaintiff filed a grievance pertaining to property that was supposed to have been forwarded to him from MRF but which had not arrived.

117. On or about September 15, 2019, Defendant Newcomb approached Plaintiff in the chow hall and asked about the outcome of the N.O.I for eating a non-Kosher meal. Defendant Newcomb was angry that there had not been a consequence and vowed, i.e. threatened, to follow up on it.

118. On or about September 21, 2019, Plaintiff was woken up by Defendant Weems entering Plaintiff's room and tearing it apart. Defendant Weems tore the covers off of two religious books, ripped Plaintiff's playing cards, and confiscated various other belongings.

119. During this incident, Defendant Weems indicated that he had been sent by his Sergeant because the administration was upset that Plaintiff had been writing grievances. Defendant Weems continued to make statements such as "Apparently you have been bothering the administration writing grievances, so this had to happen." and "For future reference, maybe you shouldn't write anymore

grievances." This demonstrates the widespread knowledge around the facilities that Plaintiff was engaged in constitutional protected conduct and was then asked to stop because it was bothersome to the administration. This is common place in the MDOC and negatively impacts prisoners ability to effectively utilize the grievance system in the face of threats in response to their constitutionally protected conduct.

120. After recognizing Plaintiff's protected conduct, Defendant Weems proceeded to write Plaintiff a class one misconduct ticket, falsely alleging that he found six tattoo needles in Plaintiff's footlocker. The untruthfulness of this claim is obvious from the fact that Defendant Weems never photographed or otherwise preserved the tattoo needles he allegedly found, Defendant Weems indicated that Plaintiff's footlocker was labeled with his name when in fact it had not yet been labeled after his arrival, and Defendant Weems indicated that the footlocker was within Plaintiff's area of control when in fact it was outside of it.

121. Plaintiff's misconduct ticket was then reviewed by Defendant Descroche. Defendant Descroche refused to consider the obvious discrepancies in the evidence and instructed Plaintiff to plead guilty to receive a lesser punishment, which Plaintiff refused. Defendant Descroche failed to intervene to prevent Defendant Weems' retaliatory action. Defendant knew of Plaintiff's protected conduct and furthered the ongoing retaliation against Plaintiff throughout the facility by failing to properly investigate Plaintiff's claims.

122. When Plaintiff returned to his unit, Defendant Weems approached Plaintiff and stated "Oh, we're not done yet." Defendant Weems then retrieved a bin full of Plaintiff's belongings that were confiscated upon his arrival to URF. Defendant Weems urged Plaintiff to throw all of his belongings into the trash, and when Plaintiff resisted, Defendant Weems threatened to write Plaintiff another ticket. Out of fear of further retaliation, Plaintiff complied.

123. Defendant Weems continued to taunt Plaintiff after the conclusion of this incident, making comments such as "Don't go writing no grievances, now."

124. On or about September 21, 2019, Plaintiff filed a grievance pertaining to Defendant Weems retaliatory actions.

125. The next day, on or about September 22, 2019, Plaintiff asked Defendant Weems for permission to use the restroom at approximately 2:30AM, and Defendant Weems granted permission. However, Defendant Weems continued on his course of ongoing retaliation and proceeded to write Plaintiff a class two misconduct ticket, alleging that Plaintiff had been out of place without permission.

126. Later that day, Plaintiff was reviewed by Defendant Sturm for this misconduct ticket. Plaintiff urged Defendant Sturm to review camera footage, noting that it would show that Plaintiff did not go to the restroom until after he had spoken to Defendant Weems. Defendant Sturm stated that he knew this, but he upheld the misconduct ticket anyways. Instead of investigating Plaintiff's claims, Defendant

Sturm refused to investigate his claim out of retaliation for Plaintiff's protected conduct. He stated "we will see how smart he thinks he is when we sent him to the ease side." Defendant Sturm failed to intervene to prevent Defendant Weems' retaliatory action and threatened continued retaliatory actions against him. Defendant Warden Horton

127. On the same day, Plaintiff was in the chow hall and it was raining outside. Plaintiff had a removable hood on his coat, and Defendant Bawkes approached Plaintiff and said, "I bet that hood on your coat keeps you dry, huh?" Defendant Bawkes then told Plaintiff to take the hood off of his coat and not wear it on the way back, and to give the hood to his unit officer once he returned to his unit. Out of fear of further retaliation, Plaintiff complied. Plaintiff was allowed to have a coat that had a removable hood as provided by the MDOC and regulations clearly permitted Plaintiff to wear said coat to stay dry.

128. On or about September 23, 2019, Plaintiff was attempting to go to collect his food and other items ordered from the store, but Defendant Magayhee and Defendant Coullard repeatedly told Plaintiff he had to wait. Finally, at approximately 9:30AM, Defendant Coullard granted Plaintiff permission to go collect his items, but when he arrived, no staff were present to issue Plaintiff his items. He returned to his unit and asked what was going on and Defendant Magayhee and Defendant Coullard told him that they had called last call twenty minutes earlier

and they did not know how Plaintiff had missed it. Defendant Magayhee and Defendant Coullard deliberately delayed Plaintiff until he would be unable to collect his items. This was done out of retaliation and as a part of the ongoing retaliation faced by Plaintiff for utilizing his right to grieve Defendants.

129.  On or about September 25, 2019, Plaintiff went to court for a hearing on his class one misconduct ticket for allegedly possessing tattoo needles. Plaintiff explained to Hearing Officer Defendant Doe the history of threats and retaliation he had received due to filing grievances, as well as the lack of evidence that he had in fact had tattoo needles in his possession. Hearing Officer Defendant Doe not only ignored this information, but proceeded to issue the maximum sentence allowable for this offense, even though MDOC policy states that this sentence should be reserved for repeat offenders. Plaintiff had never received a dangerous contraband ticket before.

130.  On the same day, Plaintiff had a hearing on his class two misconduct ticket for allegedly being out of place without permission. Plaintiff was seen by Defendant Batho. Defendant Batho was immediately angry and disrespectful to Plaintiff, and urged Plaintiff to plead guilty to receive a lesser punishment. Plaintiff attempted to calmly explain the situation and asked Defendant Batho to review the camera footage, but RUM Batho shouted "No! I'm not looking at no fucking camera!" Defendant Batho indicated that he would simply ask Defendant Weems if

Plaintiff's story that he had asked permission to use the restroom was true, to which Plaintiff replied that "If he lied on the ticket, obviously he will lie when you ask him. Just look at the camera." Again, Defendant Batho stated that he would not look at the camera. Defendant Batho proceeded to uphold the ticket, thereby failing to intervene to prevent Defendant Weems' retaliatory action.

131. On or about September 30, 2019, Defendant Newcomb was passing out mail. Plaintiff had received grievance responses in the mail. Despite the fact that a mail room ticket was stapled to the envelope, clearly indicating the letter had already been searched, the letter had been torn open and the contents nearly torn in half. Plaintiff asked who had opened his mail and Defendant Newcomb admitted that she had, saying "Don't worry, your grievances are still there, I didn't take them."

132. On or about September 30, 2019, Plaintiff filed a grievance pertaining to Defendant Newcomb opening his mail and tearing the contents.

133. On or about October 4, 2019, Plaintiff was interviewed by Defendant Sturm pertaining to his grievance filed against Defendant Weems. Defendant Sturm denied Defendant Weems' claims that the administration was upset with Plaintiff for filing grievances.

134. Upon information and belief, after Plaintiff left the meeting, Defendant Sturm told the other officers to "watch their Ps and Qs" so they don't get in trouble.

135. On or about October 14, 2019, Plaintiff was interviewed by Defendant Thompson pertaining to his grievance filed against Defendant Newcomb. Defendant Thompson told Plaintiff that he would not investigate because he does not care, that he would send the grievance up the line despite any evidence to the contrary, and that Plaintiff has no rights because he is a prisoner.

136. From approximately October 29, 2019, until November 4, 2019, Plaintiff's cell was torn apart at least once per day by Defendant Behm, Defendant Balbierz, Defendant Benson, Defendant Olmstead, and other unit officers. Plaintiff was searched more frequently than others in his cube even though he had not committed any misconducts to warrant such frequent searches.

137. On or about October 30, 2019, Plaintiff's person was inspected three times in one hour by Defendant Collins, Defendant Gallagher, and Defendant Myotte.

138. There was no legitimate basis i.e. a security concern for these inspections or shakedowns. Instead Plaintiff was singled out. These shakedowns were done out of retaliation for Plaintiff's protected conduct.

139. On or about November 4, 2019, Plaintiff was informed that the Kosher oven at URF was broken and that the URF Kosher food prep line was using an alternative oven that was not Kosher to prepare Kosher meals. Plaintiff brought this

to the attention of Defendant Weston, but Defendant Weston denied that this was true.

140. On or about December 9, 2019, Plaintiff began working on the Kosher food prep line and Plaintiff saw firsthand that the Kosher oven was indeed broken, and the Kosher food was being prepared in an oven that was not Kosher. Plaintiff again notified Defendant Weston, and nothing was done to remedy the problem.

141. On or about December 20, 2019, Plaintiff filed a grievance pertaining to the lack of a Kosher over for Kosher meal prep.

142. On or about December 20, 2019, Defendant Weston called Plaintiff into his office and attempted to persuade Plaintiff to drop his grievance, but Plaintiff refused.

143. On or about December 25, 2019, Plaintiff was notified that he had received a misconduct ticket. Plaintiff asked Defendant Weston what the ticket was for and Defendant Weston smiled and said "Theft." Defendant Weston also made a comment to another officer, indicating that Plaintiff's grievances would go nowhere.

144. On or about January 5, 2020, Plaintiff received a hearing for his misconduct ticket. The ticket was dismissed because camera footage showed that Plaintiff was innocent.

145. On or about January 6, 2020, Plaintiff filed a grievance pertaining to Defendant Weston's retaliatory action.

146. On or about January 17, 2020, Defendant Weston made comments to other inmates and officers that he would "get" Plaintiff, implying a threat. That night, at dinner, Defendant Weston came to the dining room and made threats directly to Plaintiff, threatened to keep writing Plaintiff tickets if he continued filing grievances, stated "I told you they wouldn't go anywhere," and threatened to make the Chaplain remove Plaintiff from the Kosher diet list.

147. On or about January 18, 2020, Defendant Weston wrote Plaintiff another misconduct ticket, alleging that Plaintiff took a meal tray from the non-Kosher line and then denied taking a meal tray, lying to an officer.

148. On or about January 24, 2020, Plaintiff received a hearing for his misconduct ticket. The ticket was dismissed because camera footage showed that Plaintiff was innocent.

149. On or about January 26, 2020, Defendant Weston sent a food service employee to make Plaintiff serve non-Kosher food. Plaintiff attempted to explain why that was unacceptable, but the worker responded "Well, that's what happens when you file grievances."

150. On or about January 28, 2020, Plaintiff spoke to the food services supervisor about this behavior. The supervisor spoke to Defendant Weston, which cause Defendant Weston to become even more angry. Defendant Weston pulled Plaintiff from the Kosher food line and forced him to work on the main food line

preparing non-Kosher meals. The food services supervisor tried to place Plaintiff back on the Kosher line, but Defendant Weston rushed out, argued with the supervisor, returned to Plaintiff and stated "Ha! I win, you're working the line," and forced Plaintiff to work on the non-Kosher line. Fearful of further retaliation, Plaintiff complied.

## COUNT I
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
## (Eighth Amendment – Deliberate Indifference to Serious Medical Needs)

### *(Plaintiff v. Defendants Corizon and Healthcare Officials)*

151.  Plaintiff incorporates herein all the prior allegations.

152.  At all times relevant herein, Plaintiff had a clearly established right to be free from deliberate indifference to his serious medical needs under the Eighth Amendment to the United States Constitution.

153.  At all times relevant, Defendant Healthcare Officials were acting under the color of law and were required to obey the laws of the United States.

154.  At all times relevant, Defendant Healthcare Officials knew Plaintiff had a serious medical need where he had developed hernias, the hernias were protruding from his body, and the hernias significantly interfered with Plaintiff's ability to urinate and defecate.

155. Defendant Healthcare Officials conducted two X-ray examinations, allegedly for the purposes of identifying whether Plaintiff had a hernia, but never provided any follow-up consultation or examination results.

156. Rather than addressing the hernias, Defendant Healthcare Officials placed Plaintiff on eight pills of stool softeners per day. This caused diarrhea and even more pain. In addition, Plaintiff has suffered severe irritation as a result of prolonged diarrhea. He has requested wipes or additional bathroom tissue to alleviate this irritation, but these requests have been denied.

157. Defendant Healthcare Officials have explicitly told Plaintiff on more than one occasion that they will not treat his hernias.

158. At all times relevant to this complaint, Defendant Corizon's policy makers and decision makers maintained policies and practices that condoned and fostered the unlawful conduct of their defendant employees contracted to work in the MDOC, thereby demonstrating deliberate indifference to the constitutional rights of inmates.

159. Defendants actions and inactions constituted deliberate indifference to a serious medical need in violation of 42 U.S.C. § 1983 and Plaintiff's rights under the Eighth Amendment to the United States constitution to be free from cruel and unusual punishment.

160. As a proximate result of the illegal and unconstitutional acts of the Defendants, Plaintiff was harmed and suffered damages for his mental and emotional injury and pain, mental anguish, humiliation, and embarrassment.

## COUNT II
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (Eighth Amendment – Deliberate Indifference to Serious Medical Needs)

### *(Plaintiff v. Defendants Corizon and Healthcare Officials)*

161. Plaintiff incorporates herein all the prior allegations.

162. At all times relevant herein, Plaintiff had a clearly established right to be free from deliberate indifference to his serious medical needs under the Eighth Amendment to the United States Constitution.

163. At all times relevant, Defendant Healthcare Officials were acting under the color of law and were required to obey the laws of the United States.

164. At all times relevant, Defendant Healthcare Officials knew Plaintiff had a serious medical need where he had developed recurring streptococcal infections.

165. Defendant Healthcare Officials repeatedly made statements to Plaintiff indicating that he did not know what he was talking about and they did not need to listen to his statements about his previous infections or the external hospital physician's orders.

166. Defendant Healthcare Officials repeatedly refused to follow the orders prescribed by an external hospital physician for treating the infection if it recurred.

167. Defendant Healthcare Officials repeatedly delayed transferring Plaintiff to an external hospital when the infection recurred, leading to the exacerbation of Plaintiff's symptoms.

168. Defendant Healthcare Officials at least once delayed providing Plaintiff with his prescribed antibiotics after returning from admission to an external hospital.

169. Defendant Healthcare Officials refused to allow Plaintiff to receive probiotics as prescribed by an external hospital physician, despite the physician's explicit warning that failure to take probiotics alongside long-term antibiotics would lead to a stomach infection. Plaintiff has developed symptoms of a stomach infection as a result of this denial.

170. Despite the external physician's orders and the fact that Plaintiff's infection has recurred multiple times, Defendant Healthcare Officials have refused to allow Plaintiff to see a specialist.

171. At all times relevant to this complaint, Defendant Corizon's policy makers and decision makers maintained policies and practices that condoned and fostered the unlawful conduct of their defendant employees contracted to work in the MDOC, thereby demonstrating deliberate indifference to the constitutional rights of inmates.

172. Defendants actions and inactions constituted deliberate indifference to a serious medical need in violation of 42 U.S.C. § 1983 and Plaintiff's rights under

the Eighth Amendment to the United States constitution to be free from cruel and unusual punishment.

173. As a proximate result of the illegal and unconstitutional acts of the Defendants, Plaintiff was harmed and suffered damages for his mental and emotional injury and pain, mental anguish, humiliation, and embarrassment.

**COUNT III**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**(First Amendment – Free Exercise of Religion)**

***(Plaintiff v. Defendants Warden Patrick, Leduc, Tolley, Warden Horton, and Weston)***

174. Plaintiff incorporates herein all the prior allegations.

175. Plaintiff is an adherent of the Jewish faith.

176. In addition to observing the Jewish Sabbath, the tenets of the Jewish faith also include eating only Kosher meals and observing Shabbat and holiday services with *Minyan*. Plaintiff maintains a sincere belief in adhering to these tenets.

177. Jewish inmates have a right to meals that are *certified* Kosher.

178. In addition to Jewish Sabbath services, MRF offers certified Kosher meals for Jewish inmates, as well as Shabbat and holiday services with *Minyan*. MRF is the only MDOC facility that can accommodate these important tenets of the Jewish faith.

179. URF and other MDOC facilities offer only non-certified Kosher meals and basic Jewish Sabbath services.

180. Prior to being transferred to URF, Plaintiff was under an administrative transfer hold preventing MDOC from transferring him to another facility due to the unique ability of MRF to accommodate Plaintiff's religious beliefs. This demonstrates that MDOC recognized the infringement upon Plaintiff's religious freedom that would result from being transferred to another facility.

181. Defendants Leduc and Tolley explicitly sought to discredit Plaintiff's religious beliefs and remove the transfer hold.

182. In direct contradiction to this transfer hold, Plaintiff was actually transferred to URF. This directly inhibits Plaintiff's ability to exercise his religion, as it removed his access to certified Kosher meals, as well as Shabbat and holiday services with *Minyan*, all of which were available to him at MRF.

183. Before being transferred from MRF to URF, Plaintiff spoke to Defendant Evans in attempt to cancel the transfer due to the transfer hold, but Defendant Evans failed to intervene and acquiesced as a supervisor when Defendants Leduc and Tolley sought to have Plaintiff transferred to URF despite their knowledge that such a transfer would severely restrict Plaintiff's ability to freely exercise his religious beliefs.

184. In order for Plaintiff to be transferred from MRF to URF, the transfer would have to be approved by Warden Warren and Warden Horton. Accordingly, these Defendants failed to intervene and acquiesced as supervisors when Defendants

Leduc and Tolley sought to have Plaintiff transferred to URF despite their knowledge that such a transfer would severely restrict Plaintiff's ability to freely exercise his religious beliefs.

185. Even if there were valid interests supporting MDOC's decision to transfer Plaintiff to URF, such a decision is unconstitutional where there are less restrictive alternatives available which demonstrate that the decision was an exaggerated response to the valid interests.

186. Any legitimate need for a bed at MRF could have been satisfied by transferring a non-Jewish inmate whose rights would not be impinged, and the transfer hold demonstrated MDOC's ability to refrain from impinging on Plaintiff's rights without sacrificing their legitimate interests.

187. Defendants intentionally, knowingly, maliciously, recklessly, unreasonably, and/or gross negligently violated Plaintiff's First Amendment right to the free exercise of religion when they disregarded the transfer hold and transferred Plaintiff from MRF to URF.

## COUNT IV
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
## (First Amendment – Retaliation for Protected Conduct)

*(Plaintiff v. Defendants Leduc, Russell, Evans, Taylor, Tolley, Greason, Steece, Beaulieu, Thompson, Batho, Descroche, Bawkes, Sturm, Hearing Officer Doe, Smith, Balbierz, Newcomb, Weems, Coullard, Magayhee, Olmstead, Behm, Benson, Collins, Gallagher, Myotte, and Weston)*

188. Plaintiff incorporates herein all the prior allegations.

189. The First Amendment prohibits retaliation for protected speech or conduct.

190. At all times relevant herein, Defendants were acting under the color of law and were required to obey the laws of the United States.

191. Plaintiff engaged in constitutionally protected conduct when he filed grievances against MDOC for his legitimate concerns.

192. In retaliation for Plaintiff's protected conduct, Defendants intentionally, knowingly, maliciously, recklessly, unreasonably, and/or gross negligently retaliated against Plaintiff in attempt to deter him from continuing to engage in the protected conduct.

193. Defendants transferred Plaintiff to another facility so as to deliberately inhibit his ability to freely exercise his religion, denied Plaintiff access to food that satisfies the requirements of his religious beliefs, improperly confiscated or damaged Plaintiff's personal property, filed and upheld false misconduct charges against Plaintiff which resulted in an unjustified loss of privileges, and conducted excessive and unreasonable searches of Plaintiff's person and cell. This was done to Plaintiff without consent, probable cause, legal justification, just cause, or any other legally valid reason.

194. Such retaliation would serve as a deterrent to a person of ordinary firmness from engaging in the protected conduct.

195. The retaliation was motivated at least in part by the protected conduct.

196. There was a causal connection between Plaintiff's constitutionally protected conduct and the adverse retaliatory actions taken by Defendant against Plaintiff.

197. As a proximate result of the illegal and unconstitutional acts of the Defendants, Plaintiff was harmed and suffered damages for his mental and emotional injury and pain, mental anguish, humiliation, and embarrassment.

### COUNT V
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (Conspiracy to Deprive of Rights)

*(Plaintiff v. Defendants Leduc, Evans, Russell, Taylor, Tolley, Greason, Steece, Beaulieu, Thompson, Batho, Descroche, Bawkes, Sturm, Hearing Officer Doe, Smith, Balbierz, Newcomb, Weems, Coullard, Magayhee, Olmstead, Behm, Benson, Collins, Gallagher, Myotte, and Weston)*

198. Plaintiff incorporates herein all the prior allegations.

199. At all times relevant, Plaintiffs had a clearly established right to be free from conspiracy to violate his constitutional right to be free from retaliation for engaging in protected conduct.

200. At all times relevant herein, Defendants were acting under the color of law and were required to obey the laws of the United States. Defendants agreed to retaliate against Plaintiff for his engagement in protected conduct.

201. Defendant Officers' actions demonstrate a broad conspiracy to deprive Plaintiff of his constitutional rights. On multiple occasions, individual defendants carrying out retaliatory actions against Plaintiff made verbal comments that the retaliation was a result of other defendants indicating that Plaintiff had been filing grievances. In addition, Plaintiff has repeatedly sought assistance from supervisors, up to and including the Warden's of MRF and URF and their staff, and no assistance has been granted. Given the wide range of coordinated retaliatory actions taken against Plaintiff, and the many people who have turned a blind eye to Plaintiff's suffering, it is apparent that Defendants conspired to deprive Plaintiff of his rights.

202. Defendant Officers' actions and inactions constitute an impermissible conspiracy to deprive an individual of their rights to be free from retaliation for protected conduct in violation of 42 U.S.C § 1983 and the First Amendment to the United States Constitution.

203. As a proximate result of the illegal and unconstitutional acts of the Defendants, Plaintiff was harmed and suffered damages for his physical, mental, emotional injury and pain, mental anguish, humiliation, and embarrassment.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, CAMERON TIETZ, demands judgment and prays for the following relief, jointly and severally, against all Defendants:

a. Injunctive relief compelling the immediate transfer of Plaintiff back to Macomb Correctional Facility where he can enjoy the freedom to exercise his religious beliefs;

b. Full and fair compensatory damages in an amount to be determined by a jury;

c. Punitive damages in an amount to be determined by a jury;

d. Reasonable attorney's fees and costs of this action; and

e. Any such other relief as appears just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all triable issues, per Fed. R. Civ. P. 38(b).

Respectfully Submitted,

EXCOLO LAW, PLLC

Dated: June 29, 2020

*/s/ Solomon M. Radner*
Solomon M. Radner (P73653)
Attorney for Plaintiff
26700 Lahser Road, Suite 401
Southfield, MI 48033
(866) 939-2656
sradner@excololaw.com